22-2698 Jamelle Upson v. Geraldine Wilson, et al. Why don't we just wait. Let's let everybody file out of the court and close the door so we can hear everything counsel has to say without interruption. Okay, we're good. Attorney Bicklin, I understand you would like to reserve two minutes for rebuttal.  Is that right? Yes. Please. Good afternoon. Molly Bicklin of the New York Civil Liberties Union Foundation, pro bono counsel for Jamelle Upson. The pertinent facts at the center of this case, when Mr. Upson suffered from an acute and excruciatingly painful blockage in his small intestine, are vigorously disputed. The parties disagree on basic facts related to the encounters between Mr. Upson and each defendant, including whether he was in excruciating abdominal pain, profusely sweating and vomiting, and dizzy or laughing and joking. The only thing not disputed is that a bowel obstruction is an acutely serious and very painful illness that required hospitalization and emergency care. And that's the objective prong, right? Yes, that is not disputed. And that, I understand, is not in dispute. We'll hear from your opponent, but I understand that's not in dispute, right? That's right. On page 19 of their brief, they concede that. As a result, taking all of the reasonable inferences from the disputed facts in Mr. Upson's favor, as the district court must at this posture, a jury could find that defendants Wilson and White acted with deliberate indifference with respect to his serious medical needs. This court should therefore reverse the grant of summary judgment to defendants and remand. And significantly, this is a case where the record must be reviewed as a whole, rather than a focus on discrete facts in isolation from one another. And that record shows, in fact, that the defendant had notice and were aware of his excruciating pain, his distress, his record of three prior bowel obstructions. What does the record show about the availability of those records substantiating the three prior small bowel obstruction occurrences? I couldn't tell whether they were readily available or not in that, you know, day and a half long spread. I think it seems clear that they were, because when the final nurse actually takes a look at them, immediately whisks him to the infirmary, the telemedicine doctor then confirms that and he is right off to the hospital. And so the record such as it is makes clear that those records were available, but even regardless, he made clear to both Nurses Wilson and White of his history. And so they should have been aware of, or they were aware of his, you know, significant acute crisis. And that's why I think the records, Your Honors, that, you know, this is not just a case of him throwing up, right, and they're supposed to be aware of an acute medical emergency from him throwing up. This is him throwing up continuously, being in the severe acute pain, and also saying to them, and I've had these three obstructions and it's just like this. And what about the district court's reliance and the magistrate judge's reliance on apparently contradictory evidence given by the plaintiff with regard to Wilson's awareness of his symptoms? Apparently his affidavit and his, I guess, deposition testimony gave different accounts of how much he said, whether he had showed her the vomit, whether he was, you know, so in pain that he couldn't get up or whether he did get up, whether he said more to her or just said calm down and so on. Can you help us make sense of that, please? As an initial matter, I do think that the sham issue of fact doctrine is not appropriate here because the various testimony in his deposition is only arguably contradictory. And I think it's quite confusing, that specific passage of the deposition and where he says on page, this is page 44 of the deposition, 89, yes, I told her I've been vomiting since before, before meaning when she came to my cell earlier and I told her that I have been vomiting constantly. I think that deposition testimony could be read as consistent with his verified complaint filed far before this deposition and with his affirmation later that, in fact, he told her in the initial encounter in the cell that he had been vomiting constantly and of his complaints. And so, you know, given that he is pro se below, that defense counsel themselves did not explore that area, did not clarify this sort of confusing testimony at the deposition as well the fact that, you know, it's not, I don't think it's a reasonable assumption that his later affirmation was contrary to that, again, given this confusing deposition testimony and his earlier verified complaint. But regardless, even if this court were inclined to discount that specific testimony for the first encounter in the cell, even the district court recognized that in the second encounter in the nurse's office, he, the record is he was in excruciating pain. He could barely get on the table. He tensed up when she examined him. He told her of his prior bouts with bowel obstructions that required emergency hospitalization. And she said at the beginning, I don't think anything's wrong with you. I'm not going to treat you. Well, wait a minute. Wait a minute. That's not true. I mean, everything up to there I was following, except if you're going to start defining treatment differently, right? She does palpitate his stomach. And he even says, right, that she was pressing her fingers into his stomach. So I don't know if you don't consider physical examination treatment. I don't know why we would say that. But it's undisputed, right, that she does lay him on the table and does examine his abdomen. And then she gives what I thought was undisputed testimony that when she's tapping him, she's listening for air pockets, whatever it is she describes. And then she concludes that there's no reason to send him on. I mean, that part is not disputed by him, right? The mere fact of the palpitations is not disputed, Your Honor. Okay, so the mere fact of the palpitations is not. But he also doesn't dispute that she then drew a conclusion from the palpitations that he didn't need help, right? I think he does dispute that, Your Honor. And, in fact, his testimony is that when she told him, even beginning the exam, there's nothing wrong with you, you're probably full of shit, the quote from the record here. But then she proceeded to examine him. And I think it is consistent, and the court must take that inference in his favor here, that an exam merely designed to confirm a determination of the beginning, I'm not going to provide you with any treatment, I don't think there's any problem with you, is not an investigation that is designed to provide treatment. But if someone says, I don't think there's any problem with you, but I'm going to examine you anyway, you think that there's a permissible inference to be said, and I, in now proceeding to examine you, don't care what I hear. And that just, I don't see how you get that. I think that is the reasonable inference from this, that a jury could find of her refusal to actually do medical judgment to see. Do you think that the exercise of medical judgment and the kind of examination that would have been appropriate might have been affected by an ability to examine the medical records first to confirm that he had prior bowel instructions, when they occurred, how they presented, and other aspects of his past experience? Because, you know, his blood pressure, the bowel sounds, other aspects of the presentation might be interpreted somewhat differently if you have the records of the prior experience. And that's what struck me, that they were either not available quickly enough to inform what the nurse maybe needed to do, or, you know, they were, or she just proceeded contentedly without them and made her medical judgment on that basis. But it makes the deliberate indifference a little bit harder to show, doesn't it? I think at this stage, it's a perfectly rational inference from a jury that, in fact, was refusing to examine. I mean, Mr. Upson's testimony... Refusing to examine him? Refusing to examine the records or determine that. And so I think his testimony is that she didn't want to hear what I had to say. She was unwilling to listen to the complaints of the prior instances. A rational jury could infer, in fact, this was not that they were not available to her or a decision not to, but, in fact, a refusal. And that, I think, is the clear deliberate indifference here. Now, I think I understand your point about the availability of the records, is that there may not have been any direct testimony about whether, you know, she didn't say, and I had the records available to me, or that she told Mr. Wilson, hey, I have the records here, but I refuse to look at them. But I understand your point is that whatever was one full shift later when he talked to a nurse, whoever the one was after White, was it Williamson? Or whoever it was. That nurse immediately says, hey, I looked at your records. Shipment.  And then says, well, let's have a telemedicine appointment. And that's all in very short order. And that doctor says something to the effect of, well, I see from your medical records. So I think you're saying there a jury could infer from that interaction, which was very, very close in time, that the records were, in fact, available, even though there's nothing directly saying they were or weren't to Wilson at that moment. But that's a fair inference, right? I think it is, Your Honor. And I would also submit that his history he talked about at the other prisons where he had this, where he immediately said the symptoms, and then he was taken to the hospital for immediate treatment, also suggests that that was the appropriate response. Although, I mean, isn't the opposite or different inference available that when somebody immediately starts complaining of pain, you say, well, I don't know. I mean, it may be nothing. Why don't you rest and don't eat and let's see how it goes. And then it goes for 24 hours. And then after three shifts, they say, wow, the pain has persisted, and that's an indicator that we should get you to the hospital. I mean, that could be another perfectly reasonable medical judgment, right, to see how this goes. You're complaining of it now, but maybe it's bad, maybe it's not. I don't think that's a reasonable inference on this record for this incident, and given the stage of the case, where the inferences must be in Mr. Upson's favor, first of all. And second, you know, for many illnesses, that might be the proper course, right? But this is a very acute, excruciatingly painful illness that does require and did require for him four times in three years. She had to diagnose that pain at this point was a sign of bowel obstruction, because it could have been any number of things. I mean, it could have been something else very serious. It could have been appendicitis, right? It could have been another horrible thing, or it might have been something that wasn't. And I guess the question is, once she palpitates saying, well, I know what to look for on a body, and I don't need to see, I think in her affidavit she said, even if I had the records, it wouldn't have changed anything. It wouldn't have changed what my assessment was. And I assume that's because she's saying, because, okay, great, now I have news that you have a history of bowel obstructions. I know what to look for. I'm going to palpitate and feel. I don't feel swelling. I don't feel whatever it is, air pockets. I'm not hearing anything with the stethoscope. So I don't think it's medically indicated. I can see if it was, and she didn't check for bowel obstruction. You know, he kept saying, check for bowel obstruction. She said, I won't check for that. I can see that's a problem, but she does check for it. And it seems that the argument is that she didn't check in the right way, that she should have sent him to the hospital where they would X-ray him for bowel movements, bowel obstructions, and listening with the stethoscope and palpitating is not right. And then it seems like it's an argument about what's the proper medical treatment for someone who is displaying some symptoms that could be or could not be bowel obstruction. Respectfully, I think those inferences could be drawn by a jury. But at this stage, the inferences must be in Mr. Upson's favor and that that series of events a jury could believe and would require drawing credibility determinations here because combined with her statements that there's nothing wrong with you even before there is an investigation, before she does anything, and then simply going through the motions to confirm it, give rise to an inference that, in fact, it's a refusal determination and that the medical exam, such as it is, is not designed to provide any relief or provide him with continued care. And I think we see the opposite of that, that once a nurse actually listens and determines he is going to look at the records, immediately takes him off to the infirmary and then to the hospital. I see my time is up. Okay, thank you. We will see you again for two minutes. We have now Mr. Mix. May it please the Court. Sean Mix on behalf of Defendant Appellees Wilson and White. This Court should affirm on the basis that there's a plaintiff failed to create a tribal issue of fact, that Nurses Wilson and White violated his Eighth Amendment right by being deliberately indifferent to his medical rights. Would you mind just elevating the podium a little, that black switch and that would be great, and then you can speak more easily into the microphone. Great. Is this better, Your Honor? Thank you. I'd like to start with Nurse Wilson. It is undisputed that after first hearing of plaintiff's complaint of stomach pain, after she finished her med run, she pulled him from his cell and gave him a physical exam. It's undisputed that she used a stethoscope to listen to his bowel sounds, that she discussed his symptoms with him, that she took his vital signs, his blood pressure, his temperature, and that she determined there was no sounds consistent with the bowel movement, that there were no spasms in his abdomen, and even that, according to her, plaintiff's description of his type of pain was not the type of cramping or spasms that she had believed to be associated with the bowel. What do you do? I'm sorry. Go ahead. I'm concerned about her making a decision about this without looking for his medical records for the two or three prior occurrences of bowel obstruction. Because, I mean, he has a history, and the disease would present one way or another potentially, and he might take actions one way or another. And the fact that he was reporting pain, I'm troubled about this on a summary judgment decision that the court drew inferences in the nurse's favor as opposed to in plaintiff's favor. But, again, in her medical opinion, absent acute signs of a bowel obstruction here, even if there was a history of bowel obstructions at that point in time, and remember, context-wise, this is about an hour after she had first met with plaintiff. His signs or his symptoms had only been going on for a short period of time. He gave testimony about her discounting his claims of pain. There are different accounts of exactly what position he was in and whether she had seen vomit or hadn't seen vomit. That might have affected her diagnosis. She didn't pull the medical records. She palpated and she used her stethoscope. But that doesn't strike me as particularly thorough. And yet he was reporting all this pain. Why is this appropriate to decide at this point? Because in response to those complaints about pain, she did give him a physical examination that she uses to determine whether or not there was a bowel obstruction based on several objective data points. Notwithstanding his subjective complaints of pain. And you think she could do that effectively and responsibly without looking at his medical records and the prior history of bowel obstruction? Well, according to her testimony, absent acute signs of bowel obstruction currently, she was able to determine that at that point in time, which again was only a few hours into the start of his symptoms, that there were no signs of a bowel obstruction. But what she did do, and she does say that knowing that symptoms can get worse, she tells him not to eat anything, to make sure he shows any vomit to nurses, and to use the sick hall procedures as needed. So she left it open at that point in time, which was very early on as symptoms developed, for him to use procedures if things got worse. At that point, there could have been an opportunity to reassess that initial evaluation. And so she left open the possibility for him to use either the normal sick hall procedure to ensure he was on the next medical rounds, or the emergency sick hall procedure that he used twice already to get her to look at him. Can I ask you about what appears to be a pretty clear factual dispute between Mr. Upson's testimony repeatedly that he was in excruciating pain, and he uses varieties of terms, but it seems to repeatedly and consistently say he was in excruciating pain, and that when he was in the infirmary to be examined by Nurse Wilson, that he was hunched over in pain, that when she touched his stomach to palpitate it, he tensed up. But he repeatedly describes not just excruciating pain, but outward manifestations of that, like being hunched over in pain. And doesn't that, in your view, conflict with Nurse Wilson's affidavit, where she says, during my evaluation of the plaintiff, the plaintiff did not display signs that he was in severe pain. I did not, where is it here, well, Plaintiff's demeanor in smiling, laughing, and joking appeared inconsistent with subjective complaints of severe pain. I mean, that seems like it's a direct factual contradiction, right? Yes, there's definitely disputes on his demeanor. So if we imagine a world, as I think we must, where we credit his testimony that he was actively in front of Nurse Wilson, hunched over and physically displaying signs outwardly of suffering excruciating pain, how is it then that we don't have a jury issue as to the validity of the physical exam? Because we do have to take, I think, her testimony that she palpitates and doesn't feel or detect anything in her palpitations that is a signal or a symptom of bowel obstruction. But she herself says that signs and symptoms of a bowel obstruction could include severe pain or cramping in the abdomen, nausea, or vomiting. And he says, I was displaying signs of severe pain, and she says he wasn't. And she has listed that as a symptom. Yes, she's listed it as one symptom, but there were several other objective symptoms that she found. So let's do this. Forget about this case in bowel obstruction. Patient comes in, or doctor says, I examined the patient, and there are seven possible signs of a condition. I found that the patient displayed no signs of the condition. Patient comes in and says, no, I was displaying three out of the seven criteria for the condition. And the doctor says, well, I examined them, and I found none. And the patient says, no, I was manifesting three of them. And let's say that there's proof of three. Doesn't that go to a jury then as to whether we really know what the doctor really did exercise their medical judgment on? Consider they said, I saw none of them. But now we know that there are facts that jury could believe that, no, no, the doctor saw three. Well, not here because it's a deliberate indifference case. And she did have signs that he was not suffering a bowel obstruction, and she did say that knowing that this can get worse, don't eat anything, make sure you show any vomiting, and use the sick call procedure that made her available immediately to let me know if this gets worse. Pain is subjective. Although the plaintiff claims that there were some outward signs such that he was hunched over, he himself testified that Nurse Wilson didn't believe him. And that's in his deposition at page 87 of the Joint Appendix 123, that she said he didn't look like he was in pain, that there was nothing wrong with him. She didn't believe him. So plaintiff himself in his testimony seems to corroborate that it was her opinion that it wasn't a medical emergency at that point. Right, but he says, I looked like I was in awful shape, and she dismissed my subjective complaints. She says, he didn't have any outward manifestations of pain, and I dismissed his subjective complaints. I guess the question is, how do we resolve that? Well, again, whether or not she was being deliberately indifferent to his medical needs, she did not deny access to medical treatment by saying, well, you know, this is, again, context-wise, it's still very early in the start of symptoms. She acknowledges his complaints by giving him an examination and then says, use the sick call procedure as needed. If it gets worse, you know, we can reassess. And so that is not a deliberate denial of his access to medical treatment. She left open the possibility that if this gets worse, you have access to medical staff 24-7, and, in fact, plaintiff did utilize the emergency sick call procedure. I'm coming close, but I'd like to briefly speak to Nurse White on this issue, that there's no issue of fact on whether or not plaintiff failed to create a tribal issue of fact on whether Nurse White acted with deliberate indifference. By all accounts, this was a very brief encounter while she was on her medical run. He complained that he felt he was experiencing an emergency and that he wanted to see a nurse. She said that she was on her medical, she said to put in for sick call and then continued with her medical run. There's no evidence that at that time, in that brief interaction, she was aware of substantial risk of harm to plaintiff. She had no knowledge of the prior incidents. It was at the very beginning of her shift. He was not on her sick call chart. And complaints that I have stomach pain or vomiting just aren't enough in that brief encounter to give her an awareness of a substantial risk of harm. He says, I think, though, that there was evidence that he was drifting in and out of consciousness and his cell neighbors were collectively screaming at her to help him, suggesting that, I mean, this has been going on now for, you know, many hours. He testified that, oh, sorry. Isn't that correct, that there were other signs that he was not at all well and that he was getting support in his request for help that she, you know, didn't take immediate action on? But again, just because someone says, I have an emergency, in this quick interaction, there's no evidence that she was aware of his distress. There's a small window, but it sounds by all accounts that she was passing by on her medical run. Heard he had complained that he needed emergency medical care. She said to put in for sick call. That could be either put in a slip and you'll be seen on the next round or use the emergency sick call procedure, flag down an officer or someone else who then can get an available nurse to treat you. And just because other people said, wait, come back, that, again, doesn't necessarily indicate that she was aware, based on those complaints, stomach pain, vomiting, that that was an emergency that needed to be dealt with immediately. Thank you, sir. All right. Thank you very much. Attorney Bicklin, you have two minutes, if there's anything you would like to add. Thank you, Your Honors. I will be brief. Turning to the discussion from my colleague on the other side with respect to Nurse White, I think, again, it shows that at this stage of the proceedings, there are significant factual differences that cannot be resolved on this record without making credibility determinations. And, in fact, it's not just this case of someone saying, I'm having an emergency, but all of these manifestations. He says he's adamant that he's displaying these signs of excruciating pain, of illness, that the other people on his cell or on his floor are indicating this. And so it's not the question of, you know, every time someone says, I'm having an emergency, that the nurse have to believe it. But here, the jury could plainly infer that this was open and very clear she saw his emergent nature. Turning back to Nurse Wilson, again, I think it's not the right inquiry to say, well, as long as there was a medical exam, then there can be no deliberate indifference. Because we know from this court's precedents that if a medical exam or medical treatment is not designed to, in fact, provide relief or investigate the problem, it cannot insulate from it. You know, there's no question that she's untalented and lacking in social skills, but you just said that she performed an examination, and you're saying that that's not enough if it's what you used, the term you used in your brief, if it's a sham. What's the evidence that it's a sham as opposed to possible malpractice or possibly non-malpractice? Two pieces, Your Honor. First, her statement to him at the beginning, there's nothing wrong with you. And two, the sort of caliber of the divergence in the party's statements about what's happening at this. On this record, this court must believe that he was in excruciating pain, that he was outwardly manifesting that, that he was exhibiting symptoms of profuse sweating, dizzy, hunched over. It simply is not reconcilable with the version told by Nurse Wilson for completing a legitimate exam. Again, it's for the jury to determine which of those accounts are credible, but there's... In order for your point to prevail, the jury would have to find that what Nurse Wilson did was a sham, that she was not interested in knowing whether he was in pain or whether he had a bowel obstruction. I think they could do that, Your Honor, here. But that's what they'd have to do. That's right. Did the last nurse, the one who eventually did the telemedicine call with the doctor, did she examine his stomach? I don't recall. That is not in the record, Your Honor. Okay, so there's no indication in the record that she did any exam at all, right? But what she did do is call and have a telemedicine appointment with the doctor, right? She took him, had him ordered to the infirmary and then set up the telemedical exam. So that would be the additional treatment that she provided that presumably led her not to being sued. She didn't actually do any exam of him. I understand there's some suggestion maybe she did or maybe didn't read his medical records. But, of course, reading a medical record is not a treatment, right? It does him no good if you read the medical records and he doesn't get treated. I think it's the getting him the telemedicine appointment with the doctor who then decides hospitalization is in order, right? Like that's the thing that's good for Mr. Upson, right? I think here we would say it's not a refusal to apply independent medical judgment. Didn't she order that he be taken to the prison infirmary? Yes, the final nurse did. And that's where the medical emergency telemedicine appointment occurred and then he was treated. That's right. Diagnosed and treated, right? Yes, Your Honor. So where did Wilson do the palpitations? Was that in the infirmary? In the nurse's office. And is one better than the other inherently in some way? I think there's no issue here about one better or not. I think the infirmary perhaps is larger, has more equipment available. But there's no allegation that more services were provided to Mr. Upson in the infirmary than would have been provided in the nurse's office, other than there was eventually a telemedicine, in short order, there was a telemedicine appointment with the doctor, right? I think to the contrary. The argument is, in fact, the services in the nurse's office were not legitimate medical services in any way. That's what I'm saying. The location, I don't understand there to be an argument that the location, one was better or worse. You're correct, Your Honor. Is it possible to infer, though, that at the prison infirmary he would be surveilled for increasing discomfort and how quickly he needed to be transported to the hospital for an intervention, whereas in the nurse's office he was there temporarily and then returned to his cell? So to me, I read that as reflecting an increased level of concern about his status and probably to enable the consultation with the prison doctor as well. Certainly on this record, yes. Yeah, on this record. Anything else? Thank you, Your Honor. Thank you both very much. Very helpful arguments. We will take the case under advisement. And in particular, Attorney Bicklin, we would like to express the court's appreciation for taking this case. So thank you very much. However the case winds up, we'll agree.